

FILED
Oct 15 2020, 8:50 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Robert D. King, Jr.
David R. Thompson
The Law Office of Robert D. King, Jr.,
P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEE
SOUTHSIDE ANIMAL SHELTER,
INC.

Laura S. Reed
Riley Bennett Egloff, LLP
Indianapolis, Indiana

I N  T H E
# COURT OF APPEALS OF INDIANA

Brooke Brown, by next friend
Mark Brown,

*Appellant-Plaintiff,*

v.

Southside Animal Shelter, Inc.,
Humane Society of Clinton
County, Inc., and the City of
Indianapolis,

*Appellee-Defendant*

October 15, 2020

Court of Appeals Case No.
20A-CT-66

Appeal from the Marion Superior
Court

The Honorable Timothy Oakes,
Judge

Trial Court Cause No.
49D02-1704-CT-15339

**May, Judge.**

Brooke Brown ("Brooke"), by her next friend Mark Brown ("Brown"), appeals
the trial court's grant of summary judgment in favor of Southside Animal

Shelter, Inc. ("Southside").  Brown presents multiple issues for our review, one of which we find dispositive: Whether Southside had a duty to inform the Browns of a dog's vicious characteristics so far as they were known or ascertainable by exercise of reasonable care.  We reverse and remand.

## Facts and Procedural History

In December 2014, the Clinton County Humane Society ("CCHS") received a dog named Grieg,[1] who had been surrendered by his owner because Grieg did not get along with another dog in the household.  Grieg was a Gordon Setter.  On January 9, 2015, CCHS adopted Grieg out to Amy Dirks, who transported Grieg to Indianapolis.  At some point shortly thereafter, Grieg attacked Amy's two-year-old son, Henry, causing significant injuries.  After the bite incident, on February 16, 2015, the family surrendered Grieg to the Marion County Animal Control ("MCAC").  Amy reported on the intake form with MCAC, regarding the incident, "Nipped at son when he was giving dog a hug around neck later in day – lunged at son & bit him when toddler came up to pet the dog.  Dog had been hugged before, but we didn't see the dog's stress.  The dog had had enough."  (Appellant's App. Vol. II at 204) (errors in original).

After his arrival at the MCAC, Grieg was placed on a ten-day quarantine.  At some point during that ten-day quarantine, representatives from CCHS and

---

[1] The record and the parties also refer to the dog as "Greg."  (*See, e.g.*, Appellant's App. Vol. II at 94.)

MCAC spoke[2] about Grieg returning to CCHS. MCAC told CCHS that Grieg had bitten a child, and CCHS reacquired Grieg on February 23, 2015. At some point between that date and December 2015, CCHS adopted out Grieg to someone for a brief period of time. That person returned Grieg after the dog lunged at him.

[4] In December 2015, Darcie Kurtz, the Transport Coordinator at the Low Cost Spay and Neuter Clinic Animal Shelter in Brownsburg, visited CCHS. Kurtz had a pre-existing professional relationship with Southside.[3] She encountered Grieg and contacted Rosie Ellis, the founder and president of Southside. Kurtz asked Ellis if she could transport Grieg to Southside to be considered for adoption. Kurtz told Ellis that Grieg was "a nice boy." (*Id*. at 64.) At the time, Grieg was approximately six to eight years old.

[5] Kurtz transported Grieg to Southside on December 23, 2015. Sara Briening, a Southside employee, received Grieg. Briening testified in a deposition:

> When Gre[i]g was brought to our facility, the person that brought him said that he had been brought back. The man had said that he had lunged at him but that – I was told that there was [sic] no bite marks, there was not an actual bite. And that the general consensus was that it was miscommunication between human and animal or that it wasn't a factual incident.

---

[2] MCAC indicated CCHS contacted them and asked for Grieg back; CCHS contends MCAC called them and asked if they wanted Grieg back.

[3] The parties dispute the nature of this relationship.

(*Id.* at 80-1.)  Employees and volunteers at Southside observed and assessed Grieg for eight days, during which Grieg showed no signs of aggression.  At some point during those eight days, Briening called CCHS to learn more information about Grieg.  She testified during her deposition that the person she spoke to at CCHS did not mention the lunging incident and "that [CCHS] had had a behavior assessment done, but that he had passed that." (*Id.* at 84.) Briening asked for a copy of the assessment, which she did not receive until January 4, 2016.

[6]     On December 29, 2015, the Browns came to the shelter to adopt a dog.  The Browns visited with Grieg that day and came back on December 31, 2015.  No one at Southside told Brown about the alleged lunging incident involving Grieg's former owner.  On December 31, 2015, Brown paid Southside $275 to adopt Grieg and signed a release that stated, in relevant part:

> The undersigned agrees that the health and history of this animal is unknown and for that reason the adopter releases the Southside Animal Shelter and all it's [sic] representatives from all liability, claims and damages should the animal become ill or die, and from any situations that may arise by reason of the animal's actions, toward the person or property of the adopter or any other person.  The undersigned owner agrees that all further medical care and bill [sic] are their responsibility as of the signing of this agreement.

(*Id.* at 115.)

[7]     At approximately 1:00 a.m. on January 1, 2016, Grieg attacked six-year-old Brooke, who sustained injuries to her face.  Brooke required surgery and has

permanent scarring. After the attack, MCAC retrieved Grieg and placed him on a bite quarantine. MCAC contacted Ellis at Southside and informed Ellis that Grieg was in bite quarantine. Ellis indicated Southside did not want Grieg back and refunded Mark the adoption fee he paid for Grieg. MCAC subsequently euthanized Grieg.

[8] On April 17, 2017, the Browns filed an action against Southside, alleging Southside was negligent. On May 19, 2017, Southside filed its answer and on June 13, 2017, Southside filed its amended answer naming CCHS, Indianapolis Animal Control Services ("IACS"), and MCAC[4] as nonparties whose fault proximately caused Brooke's injuries. Brown filed an amended complaint on August 17, 2017, adding CCHS as a defendant and alleged that CCHS was negligent. On May 16, 2018, Brown filed a second amended complaint, adding IACS and MCAC as defendants and alleging they also were negligent. Brown also added claims that Southside committed fraud and constructive fraud when it represented that Grieg's history was unknown on the adoption release.

[9] On May 24, 2019, Southside filed a motion for summary judgment, arguing it was not liable for Brooke's injuries because it was not Grieg's owner or keeper at the time of the incident, because Mark had released Southside from liability by signing the adoption release, and because Southside did not commit fraud when it told Mark that Grieg's history was unknown. On May 28, 2019, IACS

---

[4] As IACS and MCAC are both agencies of the City of Indianapolis, their filings were made jointly by the City of Indianapolis.

and MCAC filed their motion for summary judgment, arguing they were not liable for Brooke's injuries because neither was Grieg's owner or keeper at the time of the incident, because of a lack of proximate cause, and because of governmental immunity. On August 22, 2019, CCHS filed its motion for summary judgment, arguing it was not liable for Brooke's injuries because it was not Grieg's owner or keeper at the time of the incident. Mark answered all of the motions for summary judgment, and the parties filed their replies in a timely manner.

[10] The trial court held a hearing on the motions for summary judgment on December 9, 2019. The trial court heard parties' arguments and took the matter under advisement. On December 11, 2019, the trial court granted all motions for summary judgment, which the court memorialized in the Chronological Case Summary with the following entry: "Parties by counsel. Oral Argument heard on Defendants' motion for summary judgment. Motions GRANTED. Cause is DISMISSED. Parties may submit more formal orders if they wish." (*Id.* at 17.)

[11] On December 11, 2019, the trial court entered a written order granting IACS and MCAC's motion for summary judgment. On December 20, 2019, the trial court entered a written order granting Southside's motion for summary judgment. On December 26, 2019, the trial court entered a written order granting CCHS's motion for summary judgment. The written orders are virtually identical, and they indicate each relevant party's motion for summary judgment was granted by the trial court. The orders do not mention the

dismissal of the cause; nor do they provide any reasoning for the trial court's decisions. On January 8, 2020, the Browns filed an appeal challenging the trial court's grant of summary judgment for Southside. Brown does not appeal the trial court's orders granting summary judgment to IACS, MCAC, or CCHS.

# Discussion and Decision

[12] We review summary judgment de novo, applying the same standard as the trial court. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). Drawing all reasonable inferences in favor of the non-moving party, we will find summary judgment appropriate if the designated evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id*. A fact is material if its resolution would affect the outcome of the case, and an issue is genuine if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences. *Id*.

[13] The initial burden is on the summary-judgment movant to demonstrate there is no genuine issue of fact as to a determinative issue, at which point the burden shifts to the non-movant to come forward with evidence showing there is an issue for the trier of fact. *Id*. While the non-moving party has the burden on appeal of persuading us a summary judgment was erroneous, we carefully assess the trial court's decision to ensure the non-movant was not improperly denied his day in court. *Id*.

[14] Our summary judgment policies aim to protect a party's day in court. *Id.* While federal practice permits the moving party to merely show that the party carrying the burden of proof lacks evidence on a necessary element, we impose a more onerous burden - to affirmatively negate an opponent's claim. *Id.* A self-serving affidavit is sufficient to preclude summary judgment if it demonstrates there are material facts in dispute, but a self-serving affidavit will not preclude summary judgment if it merely disputes a legal issue. *AM General LLC v. Armour*, 46 N.E.3d 436, 441 (Ind. 2015). Summary judgment is not a summary trial, and it is not appropriate just because the non-movant appears unlikely to prevail at trial. *Hughley*, 15 N.E.3d at 1003-04. We "consciously err[ ] on the side of letting marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious claims." *Id.* at 1004.

[15] Here, the dispositive issue is whether Southside owed a duty to the Browns and thus could have been liable for the injuries Brooke sustained when bitten by Grieg. The parties agree that it is well-established that the owner or keeper of an animal is liable when that animal injures someone. *See, e.g., Ross v. Lowe*, 619 N.E.2d 911, 914 (Ind. 1993) ("An owner or keeper who fails to exercise . . . reasonable care may be liable in negligence for the manner of keeping and controlling the dog."). The Browns also point to *Baker v. Weather ex rel. Weather*, 714 N.E.2d 740 (Ind. Ct. App. 1999), in which we held a landlord may be liable for the actions of an animal if the landlord owns or controls the property and has actual knowledge of the animal's dangerous tendencies. *Id.* at 741-2.

Finally, the Browns direct us to Indiana Model Civil Jury Instruction 1955, entitled, "Domestic Animals – Known to be Dangerous," which provides:

> A [person][entity] who knows or by reasonable care should have known that a domestic animal [he][she][it] [owns][has charge of] is vicious or dangerous to [people][other animals][property] must use reasonable care under the circumstances to prevent the animal from causing injury or damage.

The comments to the Civil Jury Instruction include reference to *Artificial Ice & Cold Storage Co. v. Martin*, 102 Ind. App. 74, 198 N.E. 446 (1935), which we find instructive here.

[16] In *Artificial Cold*, Benjamin Earl Martin, who sold and delivered ice, was contacted by Artificial Cold on August 11, 1931, to "exchange a mule which he had been working to one of said wagons for a certain horse which another one of said defendant's said delivery men had been working." *Id*. at 76, 198 N.E. at 447. Later that day, the horse kicked Benjamin and killed him. Benjamin's wife, Mary, as administratrix of Benjamin's estate, sued Artificial Ice, alleging:

> That said horse was a vicious and dangerous animal and was accustomed and in the habit of kicking and biting and was dangerous to work and handle, all of which said defendant then and there well knew when it ordered and requested said exchange and ordered and requested said decedent to use and work said horse in the place of said mule, but notwithstanding said vicious, and dangerous disposition and nature of said horse and defendant's knowledge thereof, said defendant carelessly and negligently ordered and requested said decedent to use and work said horse and carelessly and negligently failed and neglected to give said decedent any notice or warning of said vicious and

dangerous disposition and nature of said horse and of his inclination to kick, all of which said defendant knew or could and should have known at the time it ordered and requested said decedent to work and use said horse in hauling and delivering said ice.

*Id.* Our court held that the complaint was "predicated upon the alleged negligent conduct of the appellant knowingly hiring a vicious and ugly mare to decedent without warning him of such characteristics." *Id.* at 77, 198 N.E. at 448. The claim went before a jury, which returned a verdict for Mary, as administratrix of Benjamin's estate. Artificial Ice appealed.

[17] Our court relied upon *Hosmer v. Carney et al.*, 228 N.Y. 73, 126 N.E. 650 (1920), which states in relevant part:

> He is not responsible for such injury unless the vicious propensities of the animal are known to him, or by the exercise of reasonable care the same could have been ascertained. If such animal be delivered by him to another, he must inform such person of the animal's vicious characteristics, so far as known, or ascertainable by the exercise of reasonable care. If such information be given, or the person to whom the animal is delivered knows, or before injury ascertains, the vicious character of the animal, the owner is not liable. The liability of the owner is predicated upon his omission of duty in not imparting the information, but such omission does not render him liable if the negligence of the injured party contributed to the injury.

*Id.* at 75, 126 N.E. at 651 (internal citations omitted).[5] This standard, now almost a century old, is still law. Thus, we hold Southside, as the owner and/or keeper of Grieg, had a duty to inform the Browns of Grieg's "vicious characteristics" so far as Southside knew, or to the extent such knowledge was ascertainable by the exercise of reasonable care.

[18] The parties disagree as to whether Southside knew, or should have known by exercise of reasonable care, of Grieg's past aggressions. For example, Southside contends Kurtz was not an employee or volunteer at the time of Grieg's arrival at Southside, and thus any information CCHS gave Kurtz could not be considered information given to Southside by virtue of Kurtz as Southside's agent. The Browns maintain Kurtz was a volunteer at Southside at the time relevant to this action. Further, there also remains a question of fact regarding whether Southside exercised reasonable care in ascertaining Grieg's behavioral history prior to allowing the Browns to adopt him. As we have determined Southside had a duty to Brown, significant issues of material fact preclude summary judgment in this action.[6]

---

[5] Upon examination of the evidence, our court ultimately overturned the jury's verdict in favor of the estate because there existed evidence to suggest Benjamin had "watered the mare [in question] occasionally" and "she kicked at decedent previous to the exchange in August." *Artificial Ice*, 102 Ind.App. at 79, 198 N.E. at 449. Thus, our court held, "the decedent had notice of the vicious character of the mare before the exchange was made. This would relieve the appellant from the duty of imparting such knowledge to the decedent, assuming it possessed the same." *Id.*

[6] Southside contends that, should we reverse the trial court's decision and remand for further proceedings, it should be permitted to name IACS, MCAC, and CCHS again as non-parties despite the fact that the Browns' appeal challenges only the trial court's order as to Southside. However, this is an issue for determination by

# Conclusion

Because Southside had a duty to inform the Browns of Grieg's past bite history, and because there are issues of material fact regarding whether Southside breached that duty or proximately caused Brooks' injuries, the trial court erred when it granted summary judgment in favor of Southside. Accordingly, we reverse and remand for proceedings consistent with this opinion.

Reversed and remanded.

Riley, J., and Altice, J., concur.

---

the trial court, which has discretion to allow Southside to amend its responsive pleadings to include nonparties who have been previously dismissed in the same action. *See Osterloo v. Wallar ex rel. Wallar*, 758 N.E.2d 59, 64-5 (Ind. Ct. App. 2001) (trial court abused its discretion when it denied defendant's motion to add previously-dismissed co-defendant as nonparty in defendant's answer to plaintiff's complaint).